DEC 19 2023 PM1:54
FILED - USDC - BPT - CT

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

IN THE MATTER OF THE SEARCH OF
THE TARGET DEVICE

Case No. 23 mj 01089 - MEG

**Filed Under Seal**

December 15, 2023

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Daniel J. Lowndes, being duly sworn, depose and state as follows:

## AGENT BACKGROUND

1.      I am a Special Agent with the Drug Enforcement Administration ("DEA") and have

been so employed since 2021. Upon successful completion of the 16-week DEA Basic Agent

Academy in Quantico, I was assigned to the Bridgeport High Intensity Drug Trafficking Area Task

Force ("Task Force"), which is comprised of personnel from the DEA, Connecticut State Police,

Norwalk Police Department, Stamford Police Department, Stratford Police Department, Milford

Police Department and the Danbury Police Department. Prior to joining the DEA, I was a Police

Officer in the City of Burlington, in the State of Vermont for approximately three years.

2.      During the course of my career, I have participated in criminal investigations,

including investigations into suspected narcotics trafficking. My participation in the investigations

has included coordinating controlled purchases of narcotics; utilizing confidential informants and

confidential sources; conducting electronic and physical surveillance; analyzing records related to

narcotics trafficking; testifying in Grand Jury; and interviewing individuals and other members of

law enforcement regarding the manner in which narcotics traffickers obtain, finance, store,

manufacture, transport and distribute controlled substances. I have also debriefed cooperating

sources and drug distributors, as well as other local state and federal law enforcement officers,

1

regarding the manner and means employed by narcotics traffickers, including the manner in which narcotics traffickers obtain, store, manufacture, transport and package and distribute their illegal drugs, finance their distribution operations, and conceal and launder the corresponding drug proceeds.

3.      I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7) in that I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

4.      I am the case agent investigating Ramona ESPINOSA who was arrested on December 12, 2023 based upon a criminal complaint issued by this Court on December 8, 2023 for violations of Title 21, United States Code, Sections 846, 841(a)(1) and 841(b)(1)(B) (Conspiracy to Possess with Intent to Distribute and Distribution of 40 grams or more of fentanyl)(Possession with Intent to Distribute and Distribution of 40 grams or more of fentanyl ) (the "Charged Offenses").

## PURPOSE OF THE AFFIDAVIT

5.      I submit this affidavit in support of an application under Rule 41 of the Federal Rules of Civil Procedure for a search warrant authorizing the examination of one black android cellular telephone (the "TARGET DEVICE"), further described in Attachment A, which was obtained from ESPINOSA at the time of his arrest on or about December 12, 2023, and which is currently located at 1000 Lafayette Boulevard #404, Bridgeport, CT and further identified as DEA Evidence Number N-9, and the extraction from that property of electronically stored information described in Attachment B.   Based on the information set forth in this affidavit, I believe there is probable cause to believe that the TARGET DEVICE contains evidence of the Charged Offenses.

## **PROBABLE CAUSE**

6.     On December 8, 2023, I signed an affidavit in support of search warrants for 137 Griggs Street APT 1, Waterbury, Connecticut ("TARGET PREMISE 1") and 71 Giles Street APT 3, Waterbury, Connecticut ("TARGET PREMISE 2") and in support of an arrest warrant for ESPINOSA and others for the Target Offenses. A copy of that affidavit (hereinafter, the "Original Affidavit") has been attached as Attachment C and incorporated herein.[1]   On this same date, on the basis of my applications and the Original Affidavit, United States Magistrate Judge Maria E. Garcia issued the requested warrants authorizing the search of the Target Premise 1 and Target Premise 2 and the arrest of ESPINOSA for the Target Offenses.

7.     As set forth in the Original Affidavit, a DEA confidential source ("CS") made controlled purchases of approximately 50 fentanyl pills from ESPINOSA on September 11, 2023, approximately 500 fentanyl pills from ESPINOSA on September 18, 2023. and approximately 2,000 suspected fentanyl pills from ESPINOSA on November 29, 2023.

8.     Leading up to and in anticipation of each of these controlled purchases, the CS made consensually recorded calls to ESPINOSA at (475)-800-6458 (referred to in the Original Affidavit as the "Espinosa Telephone"), during which ESPINOSA and the CS would discuss the anticipated purchase of narcotics, including the date, time, and meeting location.   *See* Original Affidavit ¶ 16 (recorded call on September 10, 2023); *id.* ¶ 20 (recorded call on September 18, 2023 ); and *id.* 26 (recorded call on November 29, 2023).

---

[1] Because several defendants have not yet been located or arrested, the affidavit is being submitted with redactions, consistent with the Court's order in the matter of *United States v. Ramona Espinosa*, 3:23-mj-1069 (MEG) (unsealed).

3

9.      Following the issuing of the arrest warrant on December 8, 2023, the CS made a series of additional monitored and recorded telephone calls to ESPINSOA at (475)-800-6458 in order to arrange for the purchase of 7,000 fentanyl pills. During those calls, the CS and ESPINOSA agreed to meet at 137 Griggs Street to make the exchange.

10.     On December 12, 2023, DEA agents met with the CS at a pre-determined neutral location. The CS and the CS's vehicle were searched for contraband with negative results. The CS was provided with a "kel" transmitter. At the direction of investigators, the CS made a consensually monitored and recorded phone call to ESPINOSA at (475)-800-6458 and confirmed the meeting. However, the CS never traveled to 137 Griggs Street. Instead, after a few moments, the CS called ESPINOSA at (475)-800-6458 and told her that he/she had arrived.

11.     Thereafter, members of the DEA Bridgeport Resident Office and Norwalk Police Department Special Service initiated surveillance of 137 Griggs Street and observed ESPINOSA walking down the driveway. Agents then approached ESPINOSA wearing police insignia and placed ESPINOSA into custody. ESPINOSA was searched incident to arrest and read his *Miranda* rights which was recorded on body camera.

12.     Agents executed the search warrant of TARGET PREMISE 1, which was ESPINOSA's apartment located within 137 Griggs Street, and located approximately 10,000 suspected fentanyl pills inside her residence, including a bag of approximately 7,000 fentanyl pills that appeared prepared for delivery to the CS as discussed over the December 8, 2023 call.

13.     While searching ESPINOSA incident to arrest, investigators also seized a black android device from ESPINOSA's person (the "TARGET DEVICE").   As discussed above, the CS had placed multiple calls to (475)-800-6458 minutes prior to the arrest. During the search warrant,

4

no other phones were located inside of TARGET PREMISE 1.   The TARGET DEVICE was the only telephone seized.   For that reason, I believe the TARGET DEVICE is the device bearing phone number (475)-800-6458 that has been utilized by ESPINOSA to coordinate the sale of narcotics to the CS during the course of the DEA's investigation.   For those same reasons, as set forth in greater detail below, there is probable cause to believe, and I do believe, that evidence of ESPINOSA drug trafficking activities will be located within the TARGET DEVICE.

### INFORMATION REGARDING CELLULAR TELEPHONES AND THE REQUESTED WARRANT

14.     Based on my knowledge, training, and experience, I am aware that a mobile or cellular telephone, commonly referred to as a cell phone, are handheld wireless devices use for voice and data communication through radio signals.   A cell phone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.   In addition to enabling voice communications, cell phones offer a broad range of other capabilities.   These capabilities include running software or applications; storing contact names and phone numbers in electronic address books, commonly referred to as a cell phone user's contacts; sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Cell phones may also include geo-location and GPS technology for determining the location of the device.

15.     Based on my training and experience, I know that when a cellular device acting as a camera is used to take a phonograph or video, the device will often store information beyond the photograph itself.   This "meta data" can include, the size of the file, its location on the device, the

time and date of the photograph or video, GPS coordinates for where the photograph or video was taken, whether and when it has been accessed or modified, what device took the photograph or video, and other properties or data regarding the photograph or video.

16.     As described above and in Attachment B, this application seeks permission to search and seize things that the TARGET DEVICE might contain, in whatever form they are stored. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Even when a user deletes information from a device, it can sometimes be recovered with forensics tools. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

17.     Searching for the evidence described in Attachment B may require a range of data analysis techniques. In some cases, agents and computer analysts may be able to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. In other cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide information, encode communications to avoid using key words, attempt to delete information to evade detection, or take other steps designed to frustrate law enforcement searches for information. These steps may require agents and law enforcement or other analysts with appropriate expertise to conduct more extensive searches, such as scanning storage areas unrelated to things described in Attachment B, or perusing all stored information briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, the DEA, or other law

enforcement agency, intends to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment B.

18.     It is also requested that the Court authorize the retrieval of the above-described stored electronic information by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device. I am aware that in some cases the software or equipment necessary to analyze wireless telephones in this manner is not readily available to law enforcement during the course of the execution of a search warrant. Further, turning on wireless phones in a non-laboratory setting, where there is no "jammer" active or radio shielding devices, permits additional signals to be received by the phone and thereby alters the data present in the phone at the time of seizure. Therefore it is often necessary to remove a seized phone to a laboratory in order to preserve the data therein from being corrupted.

19.     It is also requested that warrant be deemed executed once the TARGET DEVICE has been seized in the manner described above, and that further analysis of the images be permitted at any time thereafter.

## CONCLUSION

20.     Based on this information set forth in this affidavit as well as the Original Affidavit, I respectfully submit that there is probable cause to believe that TARGET DEVICE contains evidence of the Charged Offenses as specified in Attachment B.

21.     Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.   Consequently, I submit there is reasonable cause for the Court to authorize execution

of the warrant at any time in the day or night.

Respectfully submitted,

DANIEL
LOWNDES

Digitally signed by
DANIEL LOWNDES
Date: 2023.12.15
10:57:22 -05'00'

Daniel J. Lowndes
Special Agent
Drug Enforcement Administration


Subscribed and sworn to me by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 18th day of December, 2023 in New Haven, Connecticut.

Maria E.
Garcia

Digitally signed by Maria
E. Garcia
Date: 2023.12.18
14:35:09 -05'00'

HONORABLE MARIA E. GARCIA
UNITED STATES MAGISTRATE JUDGE

8

## ATTACHMENT A

### Property to be Searched

The property to be searched is one black android (the "TARGET DEVICE") which was obtained from ESPINOSA at the time of her arrest on December 12, 2023 and which is currently located at 1000 Lafayette Boulevard, Bridgeport, Connecticut and further identified as DEA Evidence Number N-9, and the extraction of that property of electronically stored information described in Attachment B.

This warrant authorizes the forensic examination of the TARGET DEVICE for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT B

## Particular Things to be Seized

All records, information, photographs, images, videos, call logs, contacts, text messages, internet browsing history, and calendars, in any format, including any associated metadata, as well as geo-location information, that constitute evidence of a potential violations of Title 21, United States Code, Sections 846, 841(a)(1) and 841(b)(1)(B) (Conspiracy to Possess with Intent to Distribute and Distribution of 40 grams or more of fentanyl)(Possession with Intent to Distribute and Distribution of 40 grams or more of fentanyl ) (the "Charged Offenses") for the time period of August 1, 2023 through December 12, 2023 including but not limited to the following:

1. the telephone number, ESN number, IMEI number, other identifying number, serial number, and SIM card number of the TARGET DEVICE;
2. the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of the TARGET DEVICE;
3. descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described crimes;
4. any and all records, however created or stored, which tend to demonstrate ownership and use of the TARGET DEVICE, and identification bearing the name or photograph of any person, telephone books, address books, date books, calendars, personal files, and photographs of persons contained in the TARGET DEVICE;
5. any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the TARGET DEVICE, such as passwords, sign-on codes, and program design;
6. GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;
7. saved searches, locations, and route history in the memory of the TARGET DEVICE;
8. internet browsing history, to include, internet searches in the memory of the TARGET DEVICE; and
9. images and videos in the memory of the TARGET DEVICE.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored,

including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

It is specifically authorized that stored electronic information, data, information and images contained in the above-described TARGET DEVICE may be reproduced by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device/s.

It is further authorized that the officers executing this warrant may send the TARGET DEVICE to a commercial vendor outside of Connecticut to permit the analysis called for herein.

# **ATTACHMENT C**

ORIGINAL AFFIDAVIT

DEC 11 2023 AM 10:13
FILED - USDC - BPT - CT

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN RE APPLICATIONS FOR SEARCH WARRANT AND FOR COMPLAINTS AND ARREST WARRANTS | Case No. 3:23 mj 1072(MEG)<br>3:23 mj 1068(MEG)<br>3:23 mj 1069(MEG)<br>**Filed Under Seal** 3:23 mj 1070(MEG)<br>3:23 mj 1071(MEG) |

## MASTER AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR SEARCH WARRANTS AND FOR COMPLAINTS AND ARREST WARRANTS

I, Daniel Lowndes being first duly sworn, hereby depose and state as follows:

1.      I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been so employed since 2021. Upon successful completion of the 16-week DEA Basic Agent Academy in Quantico, I was assigned to the Bridgeport High Intensity Drug Trafficking Area Task Force ("Task Force"), which is comprised of personnel from the DEA, Connecticut State Police, Norwalk Police Department, Stamford Police Department, Stratford Police Department, Milford Police Department and the Danbury Police Department. Prior to joining the DEA, I was a Police Officer in the City of Burlington, in the State of Vermont for approximately three years.

2.      I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7) in that I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

3.      During the course of my career, I have participated in criminal investigations, including investigations into suspected narcotics trafficking. My participation in the investigations has included coordinating controlled purchases of narcotics; utilizing confidential informants and confidential sources; conducting electronic and physical surveillance; analyzing records related to narcotics trafficking; testifying in Grand Jury; and interviewing individuals and other members of

law enforcement regarding the manner in which narcotics traffickers obtain, finance, store, manufacture, transport and distribute controlled substances.

4.     I have debriefed cooperating sources and drug distributors, as well as other local state and federal law enforcement officers, regarding the manner and means employed by narcotics traffickers, including the manner in which narcotics traffickers obtain, store, manufacture, transport and package and distribute their illegal drugs, finance their distribution operations, and conceal and launder the corresponding drug proceeds.

5.     Based upon my experience and training, I am familiar with the manner and means commonly employed by narcotics traffickers, including the manner and means by which narcotics traffickers communicate, as well as the devices commonly utilized by them, and those methods employed by narcotics traffickers in an effort to avoid detection by law enforcement

6.     I know the relative wholesale and retail value of various types of controlled substances including fentanyl.

7.     I am also familiar with the terminology and slang commonly employed by drug traffickers.

8.     As a result of my participation in this investigation through: (a) interviews and the analysis of reports submitted by DEA and other federal, state, and local law enforcement personnel; (b) the analysis of reports of drug seizures and physical surveillance; (c) telephone toll information; (d) confidential informant debriefings; and (e) other reports and documents, I am familiar with all aspects of this investigation.

9.     I submit this affidavit in support of a criminal complaint and application for an arrest warrant charging Ramona ESPINOSA, ███████████████ ███████████ with violations of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B) and 846 (Conspiracy

to Possess with Intent to Distribute 40 Grams or More of Fentanyl), and similarly charging ESPINOSA ▓▓▓▓▓▓▓▓▓▓ with violations of and 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B) (Possession with Intent to Distribute and Distribution of 40 Grams or More of Fentanyl) (collectively, the "TARGET OFFENSES"), and in support of applications under Rule 41 of the Federal Rules of Criminal Procedure for warrants to search the following: (a) 137 Griggs Street, APT 1, Waterbury, Connecticut ("**TARGET PREMISES 1**") and 71 Giles Street, Third Floor, Waterbury, Connecticut ("**TARGET PREMISES 2**") further described in Attachments A-1 and A-2, respectively. The warrants requested would allow the government to seize evidence described in Attachment B for the **TARGET PREMISES 1** and **TARGET PREMISES 2**, respectively.

10.     Because this affidavit is being submitted for the limited purpose of securing arrest and search warrants, I have not included each and every fact known to me concerning this investigation. Instead, I have set forth only those facts which I believe are necessary to establish the existence of probable cause to support the issuance of the arrest and search warrants requested herein.

## TARGETS OF INVESTIGATION

11.     Ramona ESPINOSA has been identified as a target of this investigation. ESPINOSA resides at **TARGET PREMISES 1** located at 137 Griggs Street Apartment #1, Waterbury, Connecticut. Investigators submitted an administrative subpoena to Eversource which is an energy provider in Waterbury, Connecticut for customer information for **TARGET PREMISES 1**. The subpoena returned the name Ramona ESPINOSA as the primary customer for 137 Griggs Street, Apartment 1, Waterbury, Connecticut. Utilities records also show phone number 475-800-6458 listed for ESPINOSA which is the same number utilized by the CS to

coordinate controlled purchases of fentanyl described below. Additionally, Agents observed the names "Ramona Espinosa," ███████████████████████ printed on the mailbox for 137 Griggs Street, Apartment 1, Waterbury, Connecticut. Described in more detail below, Agents have surveilled ESPINOSA before and after multiple controlled purchases of fentanyl at **TARGET PREMISES 1.** ESPINOSA has no known criminal history.





14.     As a result of my participation in this investigation, and on the basis of other information which I have reviewed and determined to be accurate and reliable, I submit that there exists probable cause to believe, and I do believe, that ESPINOSA ████████████████ ████ have committed, are committing, and will continue to commit the TARGET OFFENSES. Specifically, as described below, ESPINOSA, ████████████████ are engaged in the sale and distribution of large wholesale quantities of fentanyl and other narcotics in the District of Connecticut.

## BACKGROUND AND PROBABLE CAUSE

15.     This investigation stems from information originally received from a DEA confidential source ("CS") in the District of Connecticut. The CS has been providing information

to the DEA since approximately 2019 and was previously a Cooperating Defendant.  CS was arrested by the DEA in July 2019 for distribution of fentanyl and was incarcerated until 2023.  CS started cooperating with agents shortly after his arrest.  CS has pleaded guilty and continues to cooperate with the government.  The information provided by CS has been corroborated, proven to be reliable and truthful, and has led to the convictions of additional subjects in the District of Connecticut and the additional seizures of heroin and drug proceeds.

16.     The CS provided investigators telephone number ███████████ and advised the user was a male subject living in Waterbury, CT who was trafficking fentanyl. Agents obtained the name █████████ 71 Giles Street, Apartment #3, Waterbury, Connecticut as the subscriber for the ███████ Telephone. On September 7, 2023, the CS received a phone call from the ██████ Telephone and spoke to a Hispanic male that agents later identified as █████████ regarding a potential purchase of narcotics.   A bilingual investigator subsequently translated the telephone call with relevant portions as follows:



|  |  |
|---|---|
| ████ | It's that I work far, towards New York. You know? I don't know if anything I can send the old lady to meet you over there. You heard? |
| CS: | Okay. |
| ████ | I'm going to give your number to the old lady so you guys can talk and meet. |

17.     Based on my training and experience, I believe that when ███████ states, "I work far, towards New York . . . I'm going to give your number to the old lady," he means that because he is located closer to New York, he will coordinate any potential drug transactions in Connecticut by giving the CS's phone number to the "old lady," who Agents believe to be the ███████ mother.

18.    A few minutes after the CS's conversation with ███████ the CS received a telephone call from a female utilizing phone number 475-800-6458 ("the Espinosa Telephone"), later identified as Ramona ESPINOSA. Agents obtained the name ███████ 71 Giles Street, Apartment #3, Waterbury, Connecticut as the subscriber for the Espinosa Telephone. A bilingual investigator later translated relevant portions of the telephone call as follows:

ESPINOSA:    Manuel gave me. You know █████████ right?

CS:    Yes

ESPINOSA:    He gave me your number and told me that you needed something, maybe?

CS:    Yea

ESPINOSA:    So I'm the one who is in charge of that. So, you tell me. If you want to come here you call me, and we can meet around here.

19.    On September 10, 2023, at the direction of investigators, the CS placed a consensually monitored and recorded telephone call to ESPINOSA on the Espinosa Telephone for the purpose of ordering 50 fentanyl pills. A bilingual investigator later translated relevant portions of the telephone call as follows:

ESPINOSA:    Hello good morning.

CS:    Good morning.

ESPINOSA:    Are you the guy that I spoke to, right?

CS:    Yes

ESPINOSA:    The guy who said would be passing by today.

CS:    I'm in Lawrence

ESPINOSA:    Ok

CS:    I'm in Lawrence but I'm headed that way tonight. But tomorrow around this time I'll call so I can pick up what I told you.

ESPINOSA:     Ok no problem

CS:     50 of the green

ESPINOSA:     Ok. How many do you want of the yellow?

CS:     Give me 50 so I can try them.

ESPINOSA:     Ok that no problem.

20.    The CS advised investigators that "green" means blue pills in coded language. Based on my training and experience on knowledge of this investigation, I believe the CS ordered 50 blue fentanyl pills and also 50 yellow pills from ESPINOSA to be purchased on September 11, 2023.

### Controlled Purchase on September 11, 2023

21.    On September 11, 2023, members of the DEA Bridgeport Resident Office ("BRO") and Norwalk Police Department Special Service ("NPDSS") initiated surveillance in the vicinity of 892 North Main Street, Waterbury, CT in anticipation of a meeting between the CS and ESPINOSA to purchase the pills discussed on September 10, 2023.

22.    At the direction of investigators, the CS was in contact with ESPINOSA throughout the day on September 11, 2023. The CS made multiple consensually monitored and recorded telephone calls to ESPINOSA on the Espinosa Telephone. Prior to the meeting, ESPINOSA sent a text message via the Espinosa Telephone directing the CS to meet her at 892 North Main Street, Waterbury, CT.

23.    Prior to the meeting, SA Lowndes and PO Rodriguez searched the CS and the CS vehicle for contraband with negative results. The CS was equipped with a "kel" transmitter which is a term for a body bug that allows agents to monitor the conversation in real time. The CS was

also issued $150 of Official Advanced Funds ("OAF") to be used towards the purchase of narcotics from ESPINOSA. Investigators then surveilled the CS to the vicinity of 892 North Main Street.

24.     Agents observed the CS park in front of 892 North Main Street. Investigators observed a Hispanic female wearing jeans, black t-shirt with a cellphone in her hand (later identified as ESPINOSA) approach the CS vehicle accompanied by an unknown Hispanic female ("UF-1"). A bilingual investigator who was monitoring the "kel" recording heard ESPINOSA ask the CS if he/she was the person that she was talking to. ESPINOSA then dialed the CS's phone number and confirmed that the CS was the person she was in contact with. Toll records indicate ESPINOSA used the Espinosa Telephone to conduct this phone call..

25.     Investigators then observed ESPINOSA enter the passenger seat of the CS's vehicle. A bilingual investigator who was monitoring the "kel" recording translated the conversation during the meeting and provided the following relevant portions:

   a. ESPINOSA explained to the CS, "I have blue and yellow pills for sale and I recently had 1,000 pills." Based on my training and experience and knowledge of this investigation, I believe ESPINOSA is telling the CS that she has blue and yellow fentanyl pills for sale and that she previously sold 1,000 fentanyl pills to someone other than the CS.

   b. ESPINOSA also told the CS, "If you need more than 1,000 pills, let me know a day earlier so that I can get them dropped off." Based on my training and experience and knowledge of this investigation, I believe ESPINOSA needs a day notice to retrieve the fentanyl pills from her source of supply.

26.     A few moments later, ESPINOSA exited the CS's passenger seat. ESPINOSA and UF-1 then walked across the street to a silver Honda CRV bearing CT registration BF57235. A DMV check shows that the Honda CRV is registered to ███████████ at 137 Griggs Street, APT 1, Waterbury, CT. ESPINOSA entered the driver's seat of the Honda and UF-1 entered the passenger seat.

27. Investigators surveilled the CS back to the neutral location. At the neutral location, Agents retrieved the "kel" recording and a clear plastic baggie containing approximately 50 suspected blue fentanyl pills marked "M" on one side and "30" on the other side. Agents field tested one pill which returned a presumptive positive for the presence of fentanyl and sent the pills to the DEA's Northeast Regional Laboratory for further processing. The CS and CS vehicle were then searched for contraband with negative results. The DEA Laboratory subsequently confirmed the pills to contain both fentanyl and acetaminophen with a total net weight of 5.39 grams.

28. Mobile surveillance was maintained on the Honda CRV after the meeting. Investigators observed the Honda CRV pull down the driveway to **TARGET PREMISES 1.** Surveillance was then terminated.

29. Following the surveillance, Agents served a DEA administrative subpoena on Eversource, an energy provider in Connecticut, for utility records associated with 137 Griggs Street. Results from Eversource confirmed ESPINOSA to be the primary customer on file for utilities at 137 Griggs Street, APT 1, Waterbury, CT. Agents then obtained a CT state license photo of ESPINOSA and showed the CS. The CS confirmed that ESPINOSA was the female the CS had met with during the controlled purchase on September 11, 2023.

### Controlled Purchase on September 18, 2023

30. On September 18, 2023, members of the DEA BRO and NPDSS initiated surveillance in the vicinity of 888 North Main Street, Waterbury, CT in anticipation of a meeting between CS and Ramona ESPINOSA.

31. Leading up to the meeting, and at the direction of investigators, the CS had made multiple consensually monitored and recorded telephone calls to the Espinosa Telephone for the purpose of purchasing 500 fentanyl pills, specifically 400 blue pills and 100 yellow pills. Prior to

the meet, the CS received a text message from the Espinosa Telephone to meet at 888 North Main Street, Waterbury, CT. Investigators met with the CS at a pre-determined neutral location. At the neutral location, Agents searched the CS's person and CS's vehicle with negative results for contraband. The CS was provided with $1,500 of buy money and a "kel" digital recording device.

32.     Agents surveilled the CS to the vicinity of 888 North Main Street. Prior to the CS's arrival, investigators witnessed the silver Honda CRV bearing CT registration BF-BF57235 idling in front of 888 North Main Street which was previously identified during the controlled purchase on September 11, 2023. The CS parked in front of the Honda CRV. Agents then observed ESPINOSA exit the driver's seat of the CRV carrying a black purse. ESPINOSA entered the passenger seat of the CS's vehicle. A bilingual investigator was monitoring the "kel" and translated relevant portions of the conversation as follows:

a.     ESPINOSA advised the CS, "That was my son that you spoke to first, I will always be the one to meet with you." Based on my training and experience and knowledge of this investigation, I believe ESPINOSA meant the CS had spoken to her son at first who then provided his mother, ESPINOSA, the CS's number and that ESPINOSA will always be the making narcotics transactions with the CS.

b.     ESPINOSA was then heard telling the CS, "400 of the blue and 100 of the yellow." Based on my training and experience and knowledge of this investigation, I believe ESPINOSA at this time is describing the pills she is providing to the CS being purchased for $1,500.

33.     After a few minutes, Agents observed ESPINOSA exit the CS vehicle's passenger seat and enter back into the driver's seat of the silver Honda CRV.

34.     Agents surveilled the CS back to the neutral location. At the neutral location, Agents obtained from the CS a clear plastic bag containing approximately 400 blue pills the field tested positive for the presence of fentanyl and 100 yellow pills stamped E712 on one side and 10/325 on the other side that later tested positive for the presence of fentanyl at the Northeast

Regional Laboratory, along with the "kel" transmitter. The CS's person and CS's vehicle were then searched for contraband with negative results. Agents sent both the blue and yellow pills to the Northeast Regional Laboratory for further processing, which subsequently confirmed the exhibit to include 375 pills containing both fentanyl and acetaminophen with a net weight of 42.7 grams and 100 additional pills containing fentanyl and caffeine with a net weight of 45.4 grams.

35.     Mobile surveillance was maintained on the Honda CRV to the Plaza on the Green Apartments located at 2 North Main Street, Waterbury, CT. Agents observed ESPINOSA exit the driver's seat of the CRV and an unknown female ("UF-2") exit the passenger seat of the Honda CRV. ESPINSOA and the UF-2 then entered into the apartment building. After a few minutes, Agents observed ESPINOSA and UF-2 exit the apartment building and enter back into the Honda CRV.

36.     Mobile surveillance was maintained on the Honda CRV to 32 Linden Street where Agents observed ESPINOSA exit the driver's seat of the Honda CRV and meet with an unknown Hispanic male in the driveway of 32 Linden Street. Agents observed ESPINOSA hand the Hispanic male a white envelope and then depart.

37.     Mobile surveillance was maintained on the Honda CRV as it entered the driveway of **TARGET PREMISES 1**. Surveillance was then terminated.

### Meeting on September 28, 2023

38.     On September 28, 2023, members of DEA BRO and NPDSS initiated surveillance in the vicinity of 152 Garden Circle, Waterbury, CT in anticipation of a meeting between the CS, and ESPINOSA. The purpose of the meeting was to discuss the quality of the fentanyl pills the CS had purchased and also prices for future controlled purchases.

39.     Throughout the day on September 28, 2023, at the direction of investigators, the CS had made a series of consensually monitored and recorded telephone calls to ESPINOSA on the Espinosa Telephone. Prior to the meet, ESPINSOA sent a text message to the CS containing the address 152 Garden Circle, Waterbury, CT for the meeting location. Agents met with the CS at a pre-determined neutral location. At the neutral, Agents searched the CS and CS vehicle for contraband with negative results. The CS was issued a "kel" digital transmitter.

40.     Agents then surveilled the CS to the vicinity of 152 Garden Circle. Agents observed an older model Ford vehicle in the driveway bearing CT registration BJ71302. A registration check shows the vehicle is registered to a 2023 White CRV EXL, ▮▮▮▮▮▮▮ 137 Griggs Street APT 1, Waterbury, CT. The CS met with ESPINOSA inside of the CS vehicle.  After a few minutes, ESPINOSA brought the CS inside the residence of 152 Garden Circle. The CS advised that ESPINOSA introduced the CS to two males while within the residence, one of whom ESPINOSA introduced as ▮▮▮▮▮▮▮ and the other she introduced as her husband. Following the meeting, the CS identified ▮▮▮▮▮▮▮ as the person ESPINOSA introduced as her son, after the CS was shown a Connecticut state license photo.

41.     According to the CS, ESPINOSA spoke to the CS in front of the two males, describing how she purchases the pills for $2.50 per pill and that she also pays for a delivery charge which is $400.00, among other things.

42.     After a few minutes, the CS exited the residence and entered back into his/her vehicle. Agents surveilled the CS back to the neutral location. Agents searched the CS and CS vehicle for contraband with negative results and retrieved the "kel" from the CS.

**Controlled Purchase on November 29, 2023**.

43.    On November 29, 2023, members of the DEA BRO and NPDSS initiated surveillance in the vicinity of **TARGET PREMISES 1** in anticipation of a meeting between the CS and ESPINOSA. The purpose of the meeting was for the CS to be provided with approximately 2,000 fentanyl pills.

44.    Throughout the day of November 29, 2023, at the direction of investigators the CS had made multiple consensually monitored and recorded telephone calls and text messages to the Espinosa telephone for the purpose of purchasing 2,000 fentanyl pills. Prior to the meet, Agents met with the CS at a pre-determined neutral location. At the neutral location, Agents searched the CS and CS vehicle for contraband with negative results. The CS was issued a "kel" digital transmitter and $6,000 of official advanced funds. Prior to the meeting, the CS received a text message from ESPINOSA to meet at "137 Griggs Street". Agents surveilled the CS to the vicinity of **TARGET PREMISES 1.** While surveilling the CS to **TARGET PREMISES 1,** the CS received a phone call from ESPINOSA. A bilingual investigator was monitoring the phone call and translated relevant portions of the conversation as follows:

3:40 p.m.

ESPINOSA: Hello

CS: Hello

ESPINOSA: In 13 minutes he'll be here. Did you see the address is sent you?

CS: Yes, I'm close by.

ESPINOSA: Okay come here. So, we can see each other at the house.

CS: Come meet me outside because I have something and I can't waste time.

ESPINOSA: Okay come to the front.

3:53 p.m.

CS: I'm here by the address you gave me.

ESPINOSA: Oh okay, okay, okay. Wait because the guy is not here yet. He said about 10 minutes.

CS: 10 minutes?

ESPINOSA: Yes in 10 minutes. It appears he's close by. If you want to come up, we can wait here for him.

CS: No, I'll wait outside.

ESPINOSA: Okay then wait for me. I'm going to call him.

CS: Ok.

45.      Based on my training and experience and knowledge of this investigation, I believe ESPINOSA means her source of supply for the fentanyl pills was 13 minutes away during the phone call at 3:40 p.m. Based on my training and experience and knowledge of this investigation, I believe when ESPINOSA tells the CS "Wait because the guy is not here yet" means ESPINOSA's source of supply has not shown up with the fentanyl pills yet.

46.      After a few moments upon the CS arrival to **TARGET PREMISES 1**, Agents, observed a 2019 black Honda CRV bearing CT registration AZ90893. A DMV check of the Honda CRV is registered to ███████████ 137 Griggs Street, APT 1, Waterbury, CT. Agents then observed ESPINOSA and a male later identified as ███████ walk down the driveway of **TARGET PREMISES 1**. ESPINOSA then entered the passenger seat of the CS's vehicle and ███████ entered the rear driver's seat of the CS vehicle. Agents monitoring the "kel" observed ESPINOSA hand the CS a black plastic bag which contained 2,000 suspected fentanyl pills in a plastic heat-sealed bag. After a few moments Agents observed ESPINOSA and ███████ exit the CS's vehicle and walk down the driveway of **TARGET PREMISES 1**.

47.      Subsequent to the controlled purchase, Agents surveilled the CS back to the neutral location. Agents obtained a clear heat-sealed plastic bag containing approximately 2,000 suspected fentanyl pills from the CS. Agents transported the suspected fentanyl pills to the BRO

where they were processed and sent to the Northeast Regional Laboratory for further processing. The pills were not field tested due to the quantity of pills and safety protocols for fentanyl.[1] Agents retrieved the "kel" transmitter and searched the CS and CS vehicle for contraband with negative results.

48.     After a few minutes upon the CS departure, Agents observed the Honda CRV exit the driveway of **TARGET PREMISES 1**. Mobile surveillance was maintained on the Honda CRV to **TARGET PREMISES 2** where investigators observed an unknown female (UF-3) exit the front door of **TARGET PREMISES 2** and enter the passenger seat of the Honda CRV. Mobile surveillance was maintained to Walmart located at 910 Wolcott Street, Waterbury, CT. Agents observed COLLADO and UF-3 enter and exit the Walmart and enter back into the Honda CRV. Mobile surveillance was maintained on the Honda CRV back to **TARGET PREMISES 2**. Agents observed the Honda CRV, park behind the **TARGET PREMISES 2**. Surveillance was then terminated.

### Surveillance of TARGET PREMISES 2 on December 4, 2023

49.     On December 4, 2023, members of the DEA BRO initiated surveillance in the vicinity of **TARGET PREMISES 2**. Agents observed ██████████ and UF-3 exit the third-floor door of **TARGET PREMISES 2**. Investigators then observed the Honda CRV exit the driveway of **TARGET PREMISES 2**. Mobile surveillance was maintained on the Honda CRV to TopKat Laundromat located at 580 Lakewood Road, Waterbury, CT. After a few moments the Honda CRV exited the laundromat and was surveilled to 231 National Avenue. Agents observed ██████████ enter 231 National Avenue APT 1 and exit after a brief moment with a package in his hand. Surveillance was maintained back to the laundromat and then terminated.

---

[1] Consistent with the weights of the prior controlled purchases of pills from ESPINOSA, I believe the net weight of these pills will be over 40 grams.

**Toll Record Analysis**

50.     Agents conducted an analysis of the phone records for the ▮▮▮ Telephone and the Espinosa Telephone. Between August 14 and September 10, 2023, the ▮▮▮ Telephone and the Espinosa Telephone have contacted each other approximately 52 times. In addition, the ▮▮▮ Telephone contacted the Espinosa Telephone approximately three times within the hour prior to the controlled purchase on September 18, 2023. the Espinosa Telephone also called the ▮▮▮ Telephone approximately 1 hour after the controlled purchase.  Consistent with my training and experience, from which I am aware that drug traffickers routinely use mobile telephones to communicate with co-conspirators to conduct drug-related transactions, including to arrange meet locations, and negotiate prices of drug transactions, and to facilitate other aspects of ongoing narcotics activity, I believe that the ▮▮▮ Telephone and the Espinosa Telephone are being used, in part, for that purpose.

51.     Moreover, Agents obtained the numbers 203-721-2533 ("2533") and 203-768-6027 ("6027") from the ▮▮▮ Telephone phone records. Agents also obtained the 6027 number from Eversource as the phone number associated with ▮▮▮ Agents obtained subscriber information for the 2533 and 6027 number which identified the subscriber to be ▮▮▮ 137 Griggs Street, APT 1, Waterbury, CT for both telephone numbers—the same subscriber's name utilized by the ▮▮▮ Telephone and the Espinosa Telephone.  Through my training and experience, I know that many individuals engaged in drug activity often place phones in the name of friends, relatives, and even fictitious names to make law enforcement detection more difficult. For this reason, I believe that by utilizing the same subscriber's name as the ▮▮▮ nd Espinosa Telephones, both the 2533 and 6027 phone numbers are also likely being used to engage in drug activity.

52.     In that connection, the 2533 number appears to be the ███████ Telephone's top contact. Specifically, the ███████ Telephone and 2533 contacted each other approximately 71 times from August 7 through September 5, 2023 and similarly, the Espinosa Telephone and 2533 contacted each other approximately 14 times from August 31 to September 17, 2023. In addition, the ███████ Telephone and 6027 contacted each other approximately 49 times from August 6 through September 5, 2023. Further, the Espinosa Telephone contacted 6027 on November 29, 2023 approximately six times. Additionally, the Espinosa Telephone called 6027 at approximately 3:53pm. The Espinosa Telephone called the CS at approximately 3:53pm and ESPINOSA told the CS, "Wait because the guy is not here yet. He said about 10 minutes." At approximately 3:57pm, Agents observed the black Honda CRV pull into the driveway of **TARGET PREMISE 1.** Through my training and experience and knowledge of this investigation, I believe ESPINOSA was contacting ███████ to arrange the drug transaction with the CS. Consistent with my training and experience and knowledge of this investigation, drug dealers will often utilize multiple phones to thwart law enforcement detection. Next, drug dealers will often have multiple people working for them as lookouts, runners and stash holders to protect and store narcotics. Consistent with the phone records and recorded conversations with the CS, Agents have reason to believe LIRIANO is utilizing multiple individuals to operate a drug trafficking organization.

## CONCLUSION

53.     Based upon the information presented above, I believe that ESPINOSA, ███████ ███████████████ are engaged in the TARGET OFFENSES.

54.     In addition, based upon the controlled purchases from ESPINOSA and the surveillance conducted related to those purchases by law enforcement, I also believe that ESPINOSA and her co-conspirators are using the **TARGET PREMISES 1** and **TARGET**

**PREMISES 2** to store, package and/or sell narcotics in furtherance of the TARGET OFFENSES. Based on toll analysis and surveillance before and after the November 29, 2023 controlled purchase, I believe ████████████████████████ are conspiring with ESPINOSA to traffic large amounts of fentanyl. This is further supported by ████████ name being associated with both **TARGET PREMISES 1** and **TARGET PREMISES 2** and being the subscriber of both the Espinosa Telephone and the ████ Telephone, both of which have been used to coordinate narcotics deliveries in this case.

55.     Based upon the totality of the facts and circumstances set forth herein, my training and experience, my personal involvement with this case, consultations with fellow law enforcement officers, and my familiarity with the practices and methods of narcotics trafficking, I know that:

a.  narcotics traffickers must maintain on hand U.S. currency in order to maintain and finance their on-going narcotics business;

b.  narcotics traffickers maintain books, records, receipts, notes, ledgers, money orders and other papers relating to the transportation, receipts, sale and distribution of controlled substances. The aforementioned books, records, receipts, notes, ledgers, etc., are typically maintained where traffickers have ready access to them, including within their stash houses, residences and automobiles;

c.  persons involved in narcotics trafficking conceal in their residences, stash houses or within their automobiles caches of drugs, scales, drug packaging materials, cutting agents and diluents, large amounts of currency, financial instruments, precious metals, jewelry and other items of value and/or proceeds of drug transactions; and the evidence of financial transactions relating to obtaining, transferring, secreting or spending of sums of money made from narcotics trafficking activities;

d.  it is common for narcotics traffickers to hide contraband, proceeds of drug sales and records of drug transactions in secure locations within their residences, stash houses or within their automobiles for ready access and for concealment of these items from law enforcement authorities;

e.  narcotics traffickers commonly utilize cellular telephones to conduct their drug trafficking business and that they maintain addresses or telephone numbers in

books, papers, cellular telephones or electronic organizers which reflect names, addresses and/or telephone numbers of their clients and associates in the drug trafficking organization. Traffickers also maintain photographs and videotapes of participants and associates in narcotic trafficking activity, and property acquired as a consequence of narcotics trafficking activities;

f.   narcotics traffickers commonly have in their possession, or at their residences, stash houses and in their automobiles police scanners used to detect law enforcement activity, and firearms, ammunition and other weapons that are used to protect and secure a narcotics trafficker's property.[2]

56.   Specifically, the type of evidence that is typically found at a location from which a drug trafficker operates, and which I anticipate seizing, includes, but is not limited to: United States currency and other financial instruments that may constitute proceeds of drug transactions; the evidence of financial transactions relating to obtaining, transferring, secreting or spending of sums of money made from engaging in narcotics trafficking activities; records, notes, ledgers and other papers and documentation relating to the transportation, receipt, sale and distribution of controlled substances; photographs and videotapes of participants and associates in narcotic trafficking activity, including those contained within cameras, cell phones and other personal electronic devices; contraband, quantities of narcotics, scales, residue of narcotics, cutting agents and other drug paraphernalia; addresses or telephone numbers in books, papers, cellular telephones or electronic organizers and their electronically stored contents, which reflect names, addresses, telephone numbers of and text messages to or from their associates and/or clients in narcotic trafficking activity; police scanners; firearms, ammunition and other weapons; key-lock and combination safes and other secure storage containers and their contents; identification documents

---

[2] For example, Agents observed multiple surveillance cameras in the front and back of **TARGET PREMISES 2**. Based on my training and experience and knowledge of this investigation, I know drug dealers will often utilize security cameras to protect locations that contain drugs and other illegal items.

and keys evidencing a possessory interest in the premises, vehicles and storage containers, all of which constitute evidence, fruits, and instrumentalities of the TARGET OFFENSES.

57.    Based on my investigation, and the investigation of others, there is probable cause to believe, and I do believe that the items set forth above, all of which constitute contraband, fruits and instrumentalities of the TARGET OFFENSES will be found within the **TARGET PREMISES 1** and **TARGET PREMISES 2**. These items would constitute evidence of and a means of committing the criminal offenses referred to above, and would be instrumentalities of the commission of federal narcotics trafficking offenses.

58.    WHEREFORE, I respectfully request the issuance of an arrest warrant, charging Ramona ESPINOSA, ████████████████████████████████████ with violations of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B) and 846 (Conspiracy to Possess with Intent to Distribute 40 Grams or More of Fentanyl), and similarly charging ESPINOSA ███████████ ████ with violations of and 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B) (Possession with Intent to Distribute and Distribution of 40 Grams or More of Fentanyl) , and to search and seize the items described above from the **TARGET PREMISES 1** and **TARGET PREMISES 2**.

Respectfully submitted,

DANIEL LOWNDES    Digitally signed by DANIEL LOWNDES
                  Date: 2023.12.08 12:53:46 -05'00'

Daniel Lowndes
Special Agent
Drug Enforcement Administration


Subscribed and sworn to me by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on _December 8_, 2023 at New Haven, Connecticut.

HON. MARIA E. GARCIA
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A-1**

**Property to Be Searched**

**Target Premises 1** is located at 137 Griggs Street Apartment #1, Waterbury, Connecticut. The door to apartment #1 is a white door on the left-hand side with a black mail box affixed to the residence to the left of the door with the names Ramona ESPINOSA, Juan FIGUEROA, Manuel LIRIANO and Jose COLLADO written on it.



## ATTACHMENT A-2

### Property to Be Searched

**Target Premises 2** is located at 71 Giles Street, Floor 3, Waterbury, Connecticut. The third-floor door is accessed to the rear of the residence up three flights of stairs and is a white door on the right-hand side of the house if looking from the rear.



**ATTACHMENT B**

**Particular Things to be Seized**

All evidence relating to violations of 21 U.S.C. § 841(a)(1) (distribution of and possession with intent to distribute narcotics) and 21 U.S.C. § 846 (conspiracy to distribute and to possess with intent to distribute narcotics) occurring within the District of Connecticut, and elsewhere, including:

1. Controlled substances, including the residue of controlled substances, possessed in violation of 21 U.S.C. § 841(a)(1), including, but not limited to, fentanyl;

2. Any other contraband, including materials for packaging, processing, diluting, weighing, and distributing controlled substances, including, but not limited to, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, plastic bags, heat sealing devices, and dilutant, fillers, and cutting agents;

3. Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances, including computerized data, computer discs, computers, laptop computers, and computer related equipment such as internet routers, other networking equipment, and information;

4. Personal books, papers, receipts, notes, ledgers, and photographs reflecting identities, names, addresses, telephone numbers, and other contact or identification data relating to the transportation and distribution of controlled substances;

5. Cash, currency, and records relating to income and expenditures of money and wealth, to wit: money orders, wire transfers, cashier's checks, receipts, bank statements,

passbooks, checkbooks, checkbook registers, safety deposit box rental agreements and safety deposit box, keys, as well as precious metals and gems such as gold, silver, diamonds;

6. Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the vehicle that is the subject of this warrant, including but not limited to mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys;

7. Records of the accumulation of assets, such as ledgers, diaries, balance sheets and financial statements reflecting assets and liabilities;

8. Bank records, including monthly statements, canceled checks, and deposit and withdrawal forms and receipts;

9. Documents indicating travel in interstate and foreign commerce, to include airline tickets, notes and travel itineraries, airline schedules, bills, charge card receipts, hotel, motel, and car rental statements, correspondence with travel agencies and other travel related businesses, airline rent-a-car, and hotel frequent flier or user cards and statements, passports and visas, immigration/naturalization papers, telephone bills, photographs of foreign locations, and papers relating to domestic and international travel;

10. All electronic devices, including computer equipment or digital devices, capable of being used to further the crimes referenced above, including those which can be used to store data or access the internet, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes including, but not limited to: wireless

communication devices including cellular telephones and paging devices, computers, tablets, personal digital assistants, or other electronic devices capable of creatin or storing information including any electronic storage media, hard drives, thumb drives, flash memory, or devices; and any password or security device that can be used to control or obtain access to any item described in this paragraph;

11. Firearms, ammunition, holsters, and weapons and destructive devices; and

12. Safes and other secure storage containers.